IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-3136

VALERIE MOLANO,

      Plaintiff,

v.

DOWNTOWN'S HEALTH CARE, LLC d/b/a REGEN REVOLUTION, LLC, a Colorado corporation,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

Plaintiff Valerie Molano ("Valerie"), by and through her attorneys, Aaron Slade and Danielle C. Jefferis of Novo Legal Group, L.L.C., hereby submits her Complaint against Downtown's Health Care, LLC ("DHC"), and in support thereof states as follows:

### INTRODUCTION

1.    When Valerie started working at Downtown's Health Care, LLC ("DHC"), an alternative medicine provider of which Valerie herself was a patient, she looked forward to advancing her career in marketing and event planning.

2.    Valerie suffers from a chronic medical condition, endometriosis, which causes intense symptoms of pain, nausea, and gastrointestinal problems.

3.    Despite her disability, Valerie succeeded in DHC's marketing department, quickly advancing to Marketing Lead within just one year of working there.

4.      While Valerie can usually manage her chronic disability, sometimes it causes such intense symptoms she is unable to report to work in person in an office setting. She requires flexibility to work from home on occasion to allow her time to mitigate her symptoms, resume her work, and shift her hours accordingly.

5.      DHC knew of Valerie's disability at the time they hired her, and she repeatedly requested a reasonable modification to her work conditions for a hybrid work schedule to manage her symptoms while still completing her work at home instead of the office.

6.      DHC agreed that Valerie should have a hybrid schedule, but when Valerie took steps to implement the accommodation, DHC repeatedly ignored her and refused to engage with her to set-up her hybrid work arrangement.

7.      The more Valerie inquired about an accommodation for her disability, the more DHC discriminated against her.

8.      DHC engaged in a campaign of disability-based discrimination against Valerie, baselessly accusing her of abusing the company's sick leave policy and repeatedly disciplining her for taking time away from work to tend to her chronic disability rather than providing her a reasonable accommodation.

9.      DHC's discrimination and abuse culminated in a disability-based hostile work environment, and eventually resulted in DHC discriminatorily terminating Valerie's employment.

10.     Valerie seeks redress for DHC's violations of federal and state laws which protect disabled workers from discrimination in the workplace.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).

## PARTIES

13.    Plaintiff Valerie Molano is an individual who resides in the city of Westminster, Colorado, which is situated within the District of Colorado.

14.    Defendant Downtown's Health Care, LLC ("DHC") is a Colorado corporation with its principal place of business located in the city of Denver, Colorado, which is situated within the District of Colorado.

## FACTUAL ALLEGATIONS

*Valerie's Qualifications*

15.    At the time she applied to work at DHC, Valerie was a 39-year-old marketing and event planning professional.

16.    Valerie has studied new media communications, audio engineering, music production, marketing, and management.

17.    Before applying to work at DHC, Valerie had held positions including Event Producer, Account Manager, Social Media Manager, Customer Service Representative, Assistant Sound Engineer, Internet Travel Agent, and Musician.

18.    Valerie looked forward to taking another step along her developing marketing and event planning career path when she applied to work at DHC.

*Valerie's Disability and Physical Impairments*

19.     Valerie suffers from endometriosis, a chronic disease where tissue similar to the tissue that lines the uterus grows outside the uterus. Endometriosis can cause severe, life-impacting pain during menstruation, sexual intercourse, bowel movements and/or urination, chronic pelvic pain, abdominal bloating, nausea, fatigue, and sometimes infertility.

20.     Valerie's medical providers first diagnosed her with endometriosis in 2017.

21.     Valerie has undergone two different surgeries because of endometriosis, including having an ovary removed and a tubal ligation.

22.     The severity of Valerie's endometriosis has fluctuated over the approximately six-year time span since her initial diagnosis.

23.     On most days, Valerie can manage her endometriosis symptoms. She experiences minimal pain, nausea, bleeding, and gastrointestinal problems.

24.     However, endometriosis is unpredictable, and severe symptoms can arise with little warning. Intermittent periods of severe endometriosis symptoms are referred to as an "endometriosis flare."

25.     Valerie experiences endometriosis flares nearly every month, typically around the time of menstruation. At times, Valerie experiences nearly constant endometriosis pain.

26.     During a flare, Valerie's condition disables her from being able to perform major life activities. For example, Valerie experiences severe, debilitating pelvic and abdominal pain, nausea, excessive and abnormal bleeding, bloating, constipation, and fatigue that prevents her from sleeping, eating, walking, bending, concentrating, thinking, and working.

27.     On the days when she experiences an endometriosis flare, Valerie can perform work activities if she has accommodations that allow her to treat and tend to her symptoms while working remotely at home.

28.     For example, while at home, Valerie can take breaks more often and lay down to rest to help ameliorate abdominal pain, cramping, and fatigue.

29.     Valerie also has more readily available access to pain medications, heating pads, and other tools to help treat her pain during an endometriosis flare.

30.     Valerie also has constant access to a bathroom at home, where she can use the restroom freely for urgent gastrointestinal symptoms like vomiting and diarrhea without waiting.

***DHC's Knowledge of Valerie's Disability and Physical Impairments***

31.     In August 2019, Valerie applied for an Event Coordinator position at DHC.

32.     DHC is a medical clinic that provides chiropractic, aesthetic, cosmetic, and other alternative medicine treatments.

33.     Valerie was excited about the job opening because it aligned her skills in marketing with her interests in alternative medicine and helping people struggling with chronic health conditions.

34.     During the application process for the DHC position, Valerie interviewed with Rachel Anders ("Ms. Anders"), the Executive Director at DHC.

35.     During the interview, Valerie told Ms. Anders that she had endometriosis and discussed openly the severity of her condition.

36.     After hearing about her experience, Ms. Anders proposed that Valerie get treatments for endometriosis at DHC. They discussed the services that DHC offered for endometriosis patients.

37.     At the time of her interview, Valerie did not ask Ms. Anders or anyone else at DHC for a reasonable accommodation. Valerie planned on performing the job without any accommodations first, and then she would reassess whether she ultimately needed them later.

38.     After her interview, Ms. Anders hired Valerie as an Event Coordinator to work in DHC's marketing department.

39.     At all times during Valerie's employment at DHC, Ms. Anders was her direct supervisor.

40.     Throughout her employment, Valerie was also a patient at DHC. DHC provided Valerie intravenous infusions and chiropractic care for endometriosis pain. DHC providers also gave her hormone replacement treatments where DHC providers managed and controlled her hormone levels.

41.     Valerie regularly confided in Ms. Anders and Dr. Gary Rademacher, CEO of DHC, for advice on endometriosis treatment and the treatment options DHC provided.

42.     At times Ms. Anders and Dr. Rademacher recommended outside providers to Valerie for endometriosis treatment in addition to treatments at DHC.

43.     Ms. Anders knew about Valerie's physical limitations and impairments with endometriosis throughout her employment at DHC.

***Valerie's success at DHC***

44.     Valerie immediately succeeded at DHC. Within one year of working there, DHC promoted Valerie to lead the marketing department.

45.     As Marketing Lead, Valerie had the following essential duties: oversee event coordination including conducting team meetings, reviews of her subordinates, and participating in weekly staff and executive council meetings, manage and answer inbound new patient calls, make outbound calls to potential new patients, train subordinates and event staff, author marketing scripts, manage events, manage social media, manage registered nurses and medical technicians at events, create digital content, media and advertising, create media content including videos, livestreams and testimonials.

46.     Throughout 2021, the first full year with Valerie as Marketing Lead, the marketing department at DHC performed well.

47.     Key Performance Indicators ("KPIs") for the marketing department for 2021 exceeded those for 2019 and 2020 due to Valerie's leadership.

48.     Because of Valerie's efforts, DHC saw the number of new patients raise above those from 2019 and 2020.

49.     Valerie managed to achieve these results despite being short staffed for nearly half of 2021, having to spend time training new staff throughout the year, and treating her chronic disability.

50.     In 2021, Valerie took a total of six days of paid time off and two and a half days of sick time.

51.     At the end of 2021, Valerie openly expressed to Ms. Anders and DHC management that she wanted to improve her health to allow her to focus more on her work as Marketing Lead.

In her end-of-year self-assessment, which she submitted before meeting with DHC management, Valerie stated that her primary personal goal was to figure out her health issues and get further treatment to improve her endometriosis.

### DHC Refuses to Provide Valerie a Reasonable Accommodation

52.    DHC also completed an end-of-year assessment of Valerie's performance in 2021.

53.    In the written performance review, DHC stated that Valerie had "inconsistent attendance" throughout 2021, which was one of her "biggest gap[s]."

54.    Importantly, DHC never mentioned, informed, nor talked to Valerie once during 2021 about excessive tardiness or absenteeism, much less reprimanded her for any violations.

55.    In January 2022, Valerie met with Ms. Anders, Khayla Paschall, a Human Resources manager, Kaila Jacobi, a production manager, and Dr. Rademacher, to go over her performance review.

56.    During the meeting, Ms. Anders made it clear that DHC wanted Valerie to improve her attendance.

57.    Valerie disagreed that she had excessive absences or tardiness in 2021, but also reminded Ms. Anders of the challenges and distraction she faces when mitigating recurring endometriosis flares—a fact Ms. Anders already knew.

58.    Valerie explained that when she was unable to work in the office during an endometriosis flare, it helped to have the flexibility of a hybrid schedule while treating and managing her symptoms. In response, Ms. Paschall explicitly voiced her agreement.

59.     At this point in the conversation, Ms. Paschall offered Valerie a reasonable accommodation to allow her to continue performing her position as Marketing Lead while managing and treating her endometriosis.

60.     Ms. Paschall offered Valerie a hybrid work schedule, with flexibility to work remotely from home while she was experiencing symptoms of an endometriosis flare and not able to work in an office setting, while working in the office on days when she wasn't having a flare.

61.     Valerie agreed that this accommodation was reasonable and would be effective to allow her to work with her disability.

62.     In the weeks following the January 2022 meeting, Valerie emailed Ms. Anders and requested a follow-up meeting to implement the hybrid schedule offered to her as a reasonable accommodation. Ms. Anders ignored Valerie's requests.

63.     Each week, DHC sent all its staff a survey. The survey allowed staff to voice concerns and make other requests to DHC leadership.

64.     Valerie routinely filled out her surveys, and in them, she wrote that she would like to have a conversation with DHC leadership to discuss and implement the hybrid work schedule she was offered as an accommodation.

65.     Again, DHC ignored Valerie's requests.

66.     Valerie pushed herself to continue coming to the office and work despite her disability.

67.     Unfortunately, throughout 2022 Valerie's endometriosis condition worsened.

68.     DHC's failure to accommodate and provide Valerie a hybrid work schedule did not help her worsening condition, and likely exacerbated it.

69.    On January 26, 2022, Valerie went to the emergency room for severe abdominal and pelvic pain related to her endometriosis condition.

70.    On or around early to mid-February 2022, Valerie confided in Ms. Anders, seeking advice about treating her worsening endometriosis.

71.    Valerie and Ms. Anders had a long discussion about her concerns with her health and Ms. Anders recommended that Valerie try treating at Acacia Whole Health for her endometriosis condition.

72.    Despite having this conversation, Ms. Anders still refused to implement the reasonable accommodation of a hybrid work schedule they had discussed in January 2022.

73.    Beginning on March 25, 2022, Valerie started treatment at Acacia Whole Health, receiving RIFE treatments—a form of electromagnetic frequency treatment.

74.    Unfortunately, not only did the RIFE treatments fail to improve Valerie's endometriosis condition, they worsened it.

75.    Valerie began experiencing Herxheimer Reactions to the RIFE treatments. These reactions cause sudden, flu-like symptoms including fever, nausea, and headache.

76.    Herxheimer Reactions also cause flaring of underlying chronic conditions, including endometriosis.

77.    From the end of March 2022 through July 2022, Valerie experienced severe endometriosis flares, which caused violent vomiting and diarrhea, and intense pain.

78.    These endometriosis flares were the worst Valerie had ever experienced.

79.    Despite the severe flaring of her endometriosis, Valerie remained dedicated to running the marketing department at DHC and was present at the office as much as she possibly could.

80.    Because of the remarks DHC wrote on her 2021 performance review regarding attendance, Valerie knew that DHC was scrutinizing any absence she had to take.

81.    As such, Valerie could not take the risk of working remotely without first getting authorization from DHC to do so.

82.    From March 25, 2022 through July 2022, Valerie's absences and tardiness increased. She was not able to come to the office to work when she had severe flares of her endometriosis and Herxheimer Reactions.

83.    On those days Valerie was not able to work in-person at the DHC office due to her disability, she nevertheless remained in contact with her team and Ms. Anders, letting DHC know her status and at times working remotely at home while mitigating the symptoms of her flares.

84.    Valerie would have been able to work remotely during most if not all of her absences in 2022 had DHC not ignored Valerie's requests to implement the offered hybrid work schedule as a reasonable accommodation.

***DHC and Ms. Anders fostered a Disability Based Hostile Work Environment***

85.    After Valerie's January 2022 performance review meeting, DHC fostered an abusive and hostile work environment because of Valerie's ongoing disability and time off work.

86.    Ms. Anders yelled, ridiculed, and gaslighted Valerie in front of Valerie's subordinates.

87.     For example, in one instance, on or around the end of April, 2022, Ms. Anders made a snide remark about Valerie's need for time off work due to her disability in front of other employees.

88.     Valerie and Ms. Anders were discussing a new process being implemented and Ms. Anders announced angrily that she can never train Valerie on the new process since she is "gone all the time"—suggesting that Valerie was simply not working by choice and abusing DHC's time-off policy.

89.     Valerie spoke up and defended herself. She told Ms. Anders that the comment was unnecessary, and she should not talk about her need for sick time in front of other employees.

90.     In response, Ms. Anders yelled "shut up" to Valerie and accused her of being defensive.

91.     Ms. Anders stormed out of the room and into her office and slammed the door behind her.

92.     Minutes later, Ms. Anders called Valerie into her office, shut the door, and continued to berate her and yell at her.

93.     Ms. Anders's yelling was so loud that other DHC employees could hear it.

94.     Soon after, on April 27, 2022, Ms. Anders put Valerie on a Performance Improvement Plan ("April 2022 PIP").

95.     Ms. Anders claimed that Valerie had excessive absenteeism from work, when in fact, all of Valerie's absences were either valid uses of her sick time within company policy, approved Paid Time Off/Vacation, or days in which she offset her absence by after-hours work Valerie performed at the office on the weekend.

96.     The April 2022 PIP contains multiple obvious errors on Ms. Anders's part, where days in which Valerie had requested and been approved for time off were being counted as "unexcused absences."

97.     Another date listed in the April 2022 PIP that Ms. Anders listed as an "unexcused absence" in which Valerie was a "no call no show" was documented on DHC's company time off calendar as a day in which Valerie was absent due to travel delays coming back from approved PTO that were beyond her control.

98.     Yet other days Ms. Anders listed in the April 2022 PIP were days in which Valerie was diagnosed with COVID-19 infection and per DHC company policy, could not come into the office.

99.     Ms. Anders artificially inflated the number of Valerie's unexcused absences in order to falsely accuse that Valerie was in violation of DHC time off policy.

100.     The April 2022 PIP also failed to mention that Valerie had communicated with Ms. Anders about making up hours on days when DHC was closed for sick time she had taken. For example, Ms. Anders had approved Valerie to work extra hours on April 8, 2022, and April 29, 2022.

101.     The April 2022 PIP threatened that future violations of the attendance policy will result in further disciplinary action.

102.     When Ms. Anders presented the April 2022 PIP, Valerie again reminded her that she needed a reasonable accommodation due to her disability of a hybrid work schedule which DHC had failed to ever implement.

103.    Ms. Anders told Valerie that DHC would implement the accommodation but said they should discuss it after the meeting.

104.    Valerie, shocked and hurt by the unexpected and baseless accusations coming from Ms. Anders, wrote Ms. Anders an email on April 28, 2022 (the day after she received the April 2022 PIP) explaining the errors contained therein and requesting a meeting to discuss them. Valerie also planned on discussing her accommodation during a follow-up meeting.

105.    Ms. Anders again ignored Valerie's requests to meet to discuss the April 2022 PIP and implementation of her reasonable accommodation.

106.    After Valerie's requests, Ms. Anders's hostility towards Valerie only increased.

107.    Valerie's direct reports noticed that Ms. Anders spoke to Valerie very aggressively and checked on Valerie's performance more often than any other employee, demanding updates on various KPIs and other information.

108.    Valerie's direct reports noticed that Ms. Anders was much nicer when Valerie was not there.

109.    Ms. Anders discussed openly Valerie's need for sick time in front of other DHC employees while Valerie was not there, suggesting that Valerie was abusing the company's PTO policy.

110.    Ms. Anders would give Valerie an instruction or request, and then later deny she ever gave Valerie the instruction or request and accuse Valerie of performing poorly.

111.    For example, on one occasion, Valerie proposed stopping in-person promotion events because of low return and low attendance post-COVID-19. Ms. Anders and Dr. Rademacher agreed and instructed Valerie to no longer calendar or schedule in-person promotion

events. Later, Ms. Anders confronted Valerie and accused her of not performing well and pointed to the fact that she did not schedule any in-person events denying that she ever gave Valerie that instruction.

112.    Further, at this point Valerie was the Marketing Lead no longer the event coordinator.

113.    At one point, one of Valerie's direct reports told Ms. Anders that she should not treat Valerie so disrespectfully as it made her feel uncomfortable.

114.    On or around August 1, 2022, Valerie, feeling the effects of the relentless hostility and abuse from Ms. Anders, requested a confidential meeting with Dr. Rademacher—the only DHC employee with authority over Ms. Anders. In her request, Valerie expressed concerns with Ms. Anders and the way she treated her.

115.    The following morning, Ms. Anders acted oddly and mentioned she had an "interesting" conversation with Dr. Rademacher on her way to work that day. Ms. Anders cryptically said that DHC would be making some changes soon.

116.    Exactly one week later, Ms. Anders issued Valerie a second Performance Improvement Plant ("August 2022 PIP"). During the meeting, Ms. Anders mentioned that it took her a week to write the August 2022 PIP.

117.    Ms. Anders again accused Valerie of excessive absenteeism in violation of DHC policy and listed days on which Valerie had used DHC's sick leave policy to treat her endometriosis condition.

118.    Ms. Anders listed a day in which Valerie got into a motor vehicle accident as an "unexcused absence" on the August 2022 PIP.

119.    Ms. Anders also listed days Valerie was exposed to COVID-19 and instructed to work remotely at home as "unexcused absences."

120.    Valerie objected to Ms. Anders's baseless accusations during the meeting, and asked "are you seriously writing me up for time that I was out sick?"

121.    Ms. Anders snapped back "I don't care what you took off for."

122.    At this point, Valerie realized that DHC would never actually accommodate her disability and provide her the hybrid work schedule she had been requesting for nearly eight months.

123.    Valerie requested a second reasonable accommodation, to step down as Marketing Lead, and work as a new patient coordinator, fully remote.

124.    Ms. Anders along with Ms. Paschall who was also in the meeting, agreed with this accommodation and encouraged it.

125.    Ms. Anders and Ms. Paschall mentioned promoting one of Valerie's direct reports—Sydney Morrison into Valerie's position of Marketing Lead. Sydney was currently a new patient coordinator.

126.    After the meeting, Valerie sent a follow-up email to Ms. Anders and DHC leadership, rebutting all of the erroneous accusations in the August 2022 PIP, and reminding DHC that the "DHC policy does not accommodate someone who has a disabling health condition that is unpredictable. A hybrid schedule was offered by upper management, and has not been discussed or set up after multiple attempts on my part to get this figured out."

127.    DHC leadership ignored Valerie's email.

128.    At this time, Valerie began feeling overwhelming feelings of anxiety, worry, stress and other mental health symptoms as a result of the hostile work environment Ms. Anders subjected her to, culminating in a second PIP at that point.

129.    A few days later, Valerie learned that her grandfather was in hospice.

130.    Valerie met with Ms. Anders and Khayla Paschall to discuss taking time away from work to get further treatment for her endometriosis, attend to her worsening mental health and visit her grandfather. Ms. Anders offered Valerie the option of a leave of absence. Valerie and DHC agreed to a 4-6 unpaid week leave of absence from DHC, with the understanding that Valerie would resume work at DHC in the fully remote, new patient coordinator position upon her return.

***DHC's Refusal to Provide Valerie Her Accommodated Position***

131.    On September 1, 2022, while still on her leave of absence from DHC, Valerie, Ms. Anders, and Ms. Paschall had a virtual meeting on Zoom where they discussed that Valerie would need to have an Americans with Disabilities Act ("ADA") provider statement filled out and returned outlining her work restrictions and limitations.

132.    Also during the Zoom call, they discussed the details of her new accommodated position, including her responsibilities and hours, and the equipment she needed to work remotely.

133.    Valerie and DHC confirmed again that her accommodated position would be fully remote, that her duties would be that of a new patient coordinator, and that she would begin on September 20, 2022.

134.    Valerie and DHC left the virtual meeting with firm expectations and a plan to implement Valerie's new accommodated position.

135.    Valerie's medical provider filled out and returned the ADA provider statement to DHC on or around September 15, 2022. The provider statement indicated that Valerie needed accommodations to be able to time-shift and take breaks when her pain is flaring and resume tasks when able. Valerie's provider stated that remote work would be an effective accommodation.

136.    On September 20, 2022, Valerie reported to DHC to pick up her equipment to set up her remote work arrangement at home as agreed to during the September 1st call.

137.    When Valerie reported to work on September 20, 2022, DHC fired Valerie.

138.    Ms. Anders and Ms. Paschall pulled Valerie into a conference room and provided her a termination letter.

139.    In the letter, DHC stated that Valerie's position was eliminated "due to a reorganization of the marketing department."

140.    However, during the meeting with Ms. Anders and Ms. Paschall, DHC told Valerie the reason for her termination was that the new patient coordinator position, Valerie's accommodated and current position, had "taken on extra duties" and is an "in-person" only position. Ms. Anders said that DHC "eliminated" Valerie's prior position of Marketing Lead.

141.    Ms. Anders stated in the meeting that the decision to terminate Valerie happened on Friday, September 16, 2022, the day after DHC received Valerie's ADA provider statement.

142.    Ms. Anders told Valerie that DHC would keep Sydney on as the sole new patient coordinator and would be hiring for a Sales and Marketing Manager position.

143.    Importantly, while DHC maintained during the meeting that it had "eliminated" Valerie's new patient coordinator position, DHC had posted an opening for a new patient coordinator position on September 13, 2022, days before Valerie's termination.

144.    Immediately after DHC terminated Valerie, DHC promoted Sydney to Marketing Lead, and then interviewed and hired an outside applicant as a new patient coordinator—the exact position Valerie was to perform on September 20, 2022 as an accommodated position.

145.    DHC never added "additional duties" to the new patient coordinator position.

146.    Similarly, the "reorganizing of the marketing department" DHC mentioned in Valerie's termination letter never happened. There were no downsizing or large-scale reductions in staff and DHC never outsourced their marketing department to an outside organization.

147.    Rather, in the months following Valerie's termination, DHC continued to discuss possibly hiring an outside marketing firm to replace the in-house marketing staff, but never did so.

148.    Eventually, DHC hired an outside company to help rebrand their company name to "Regen Revolutions' and design a new company logo; however, DHC never outsourced their marketing department.

***Valerie's Damages***

149.    Valerie suffered physically, emotionally, and financially due to DHC's failure to accommodate her position, the hostile, abusive environment DHC fostered, and her eventual termination.

150.    Valerie's endometriosis condition worsened while DHC failed to accommodate her. She suffered immense pain, discomfort and embarrassment when she had to push herself to report to the office even though she was experiencing endometriosis flares.

151.    Valerie suffered emotionally while Ms. Anders ridiculed and berated Valerie about her need for sick time out in the open in front of other employees at DHC.

152.    Valerie felt embarrassed and baselessly accused of violating company policy when in fact she was dealing with a painful and unpredictable chronic disability.

153.    Valerie did not choose to have endometriosis flares, but DHC nevertheless accused her of abusing the company's attendance policy when she was too sick to work.

154.    Valerie has undergone mental health and therapy treatments for the stress, anxiety, and embarrassment she suffered at the hands of DHC.

155.    Valerie lost income when she took days off of work that should have been accommodated by her hybrid schedule.

156.    Valerie lost income when she took a leave of absence from work in August 2022 to treat her endometriosis and attend to the mental health effects of DHC's discrimination.

157.    Valerie suffered financially after DHC again failed to accommodate her and terminated her employment, leaving her with no source of income for months as she searched for work.

158.    Valerie still suffers from paranoia and fear of being punished because of her disability, over which she has no control.

### CLAIMS FOR RELIEF
### COUNT 1
**Title I of ADA 42 U.S.C. § 12112 – Failure to Accommodate (Marketing Lead)**
*Against Defendant Downtown's Health Care, LLC.*

159.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

160.    Plaintiff suffers from chronic endometriosis, a physical impairment that substantially limits major life activities including sleeping, eating, walking, bending, concentrating, thinking, and working.

161.    Plaintiff was otherwise qualified for her position of Marketing Lead, with or without a reasonable accommodation, due to her education in media communications, marketing and management, along with her experience as an Event Producer, Account Manager, Social Media Manager, Customer Service Representative, Assistant Sound Engineer, Internet Travel Agent, and Musician.

162.    DHC knew of Plaintiff's disability since August 2019.

163.    In January 2022, Plaintiff and DHC agreed that because of Plaintiff's endometriosis symptoms, a hybrid work schedule in which Plaintiff would have flexibility to work either from home or in the office would be an effective accommodation and would allow Plaintiff to perform the essential functions of her position while tending to symptoms of endometriosis.

164.    Plaintiff requested DHC implement her reasonable accommodation and authorize her to work a hybrid schedule multiple times, through email, in-person meetings, and on her staff surveys she submitted.

165.    DHC refused to engage in an interactive process and implement Plaintiff's reasonable accommodation.

166.    From January 2022 until August 9, 2022, DHC refused to allow Plaintiff a hybrid schedule as a reasonable accommodation despite previously agreeing to do so.

167.    Instead, DHC disciplined Plaintiff and placed her on two Performance Improvement Plans primarily because of complaints of her attendance and use of sick time.

168.    When engaging in the conduct described above, DHC did so with reckless indifference to Plaintiff's federally protected rights.

169.    As a result of DHC's failure to accommodate, Plaintiff suffered financial loss, unnecessary pain, suffering, embarrassment, mental anguish, loss of enjoyment of life and other damages and losses.

## COUNT 2
### Title I of ADA 42 U.S.C. § 12112 – Failure to Accommodate (New Patient Coordinator)
### *Against Defendant Downtown's Health Care, LLC.*

170.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

171.    Plaintiff suffers from symptoms of chronic endometriosis, a physical impairment that substantially limits major life activities including sleeping, eating, walking, bending, concentrating, thinking, and working.

172.    Plaintiff was otherwise qualified for her position of New Patient Coordinator, with or without a reasonable accommodation due to her education in media communications, marketing and management, along with her experience as DHC's Marketing Lead, an Event Producer, Account Manager, Social Media Manager, Customer Service Representative, Assistant Sound Engineer, Internet Travel Agent, and Musician.

173.    DHC knew of Plaintiff's disability since August 2019.

174.    In August and September 2022, Plaintiff and DHC agreed that because of Plaintiff's endometriosis symptoms, she required a reasonable accommodation of reassignment to a New Patient Coordinator position, fully remote.

175.    Plaintiff provided DHC an ADA provider statement that indicated she needed accommodations to be able to time-shift and take breaks when her pain is flaring and resume tasks when able. Plaintiff's provider stated that remote work would be an effective accommodation.

176.     On September 20, 2022, instead of providing Plaintiff her accommodation, DHC terminated plaintiff.

177.     DHC admitted that they decided to terminate Plaintiff the day after they received her ADA provider statement.

178.     DHC posted a job opening for a New Patient Coordinator days before deciding to terminate Plaintiff.

179.     Immediately following Plaintiff's termination, DHC hired an outside applicant for a New Patient Coordinator.

180.     When engaging in the conduct described above, DHC did so with reckless indifference to Plaintiff's federally protected rights.

181.     As a result of DHC's failure to accommodate, Plaintiff suffered financial loss, unnecessary pain, suffering, embarrassment, mental anguish, loss of enjoyment of life and other damages and losses.

## COUNT 3
### Title I of ADA 42 U.S.C. § 12112 – Discriminatory Discharge
### *Against Defendant Downtown's Health Care, LLC.*

182.     Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

183.     Plaintiff suffers from symptoms of chronic endometriosis, a physical impairment that substantially limits major life activities including sleeping, eating, walking, bending, concentrating, thinking, and working.

184.     Plaintiff was otherwise qualified for her positions of Marketing Lead and New Patient Coordinator, with or without a reasonable accommodation due to her education in media

communications, marketing and management, along with her experience as an Event Producer, Account Manager, Social Media Manager, Customer Service Representative, Assistant Sound Engineer, Internet Travel Agent, and Musician.

185.    DHC knew of Plaintiff's disability since August 2019.

186.    In August and September 2022, Plaintiff and DHC agreed that because of Plaintiff's endometriosis symptoms, she required a reasonable accommodation of reassignment to a New Patient Coordinator position, fully remote.

187.    Plaintiff provided DHC an ADA provider statement that indicated she needed accommodations to be able to time-shift and take breaks when her pain is flaring and resume tasks when able. Plaintiff's provider stated that remote work would be an effective accommodation.

188.    On September 20, 2022, instead of providing Plaintiff her accommodation, DHC terminated plaintiff.

189.    DHC admitted that they decided to terminate Plaintiff the day after they received her ADA provider statement.

190.    DHC posted a job opening for a New Patient Coordinator days before deciding to terminate Plaintiff.

191.    Immediately following Plaintiff's termination, DHC hired an outside applicant for a New Patient Coordinator.

192.    When engaging in the conduct described above, DHC did so with reckless indifference to Plaintiff's federally protected rights.

193.    As a result of DHC's failure to accommodate, Plaintiff suffered financial loss, unnecessary pain, suffering, embarrassment, mental anguish, loss of enjoyment of life and other damages and losses.

**COUNT 4**
**Title I of ADA 42 U.S.C. § 12112 – Disability Harassment Hostile Work Environment**
*Against Defendant Downtown's Health Care, LLC.*

194.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

195.    Plaintiff suffers from symptoms of chronic endometriosis, a physical impairment that substantially limits major life activities including sleeping, eating, walking, bending, concentrating, thinking, and working.

196.    Plaintiff was otherwise qualified for her positions of Marketing Lead and New Patient Coordinator, with or without a reasonable accommodation due to her education in media communications, marketing and management, along with her experience as an Event Producer, Account Manager, Social Media Manager, Customer Service Representative, Assistant Sound Engineer, Internet Travel Agent, and Musician.

197.    DHC knew of Plaintiff's disability since August 2019.

198.    After Plaintiff requested a reasonable accommodation of a hybrid work arrangement in January 2022, DHC fostered an abusive and hostile work environment because of Valerie's ongoing disability.

199.    Ms. Anders targeted Plaintiff and blamed her for things out of her control.

200.    Ms. Anders yelled, ridiculed, and gaslighted Plaintiff in front of Plaintiff's subordinates.

201.    For example, in one instance, Ms. Anders made a snide remark about Plaintiff's need for time off work due to her disability in front of other employees.

202.    Plaintiff told Ms. Anders that the comment was unnecessary, and she should not talk about her need for time off work in front of other employees.

203.    In response, Ms. Anders yelled "shut up" to Valerie and accused her of being defensive.

204.    Ms. Anders stormed out of the room into her office and slammed the door behind her.

205.    Minutes later, Ms. Anders called Plaintiff into her office, shut the door, and continued to berate her and yell at her.

206.    On April 27, 2022, Ms. Anders put Plaintiff on a Performance Improvement Plan and artificially inflated the number of Plaintiff's unexcused absences to falsely accuse that Plaintiff was in violation of DHC time off policy.

207.    On August 9, 2022, Ms. Anders put Plaintiff on a second Performance Improvement Plan and again artificially inflated the number of Plaintiff's unexcused absences to falsely accuse that Valerie was in violation of DHC time off policy.

208.    Plaintiff's direct reports noticed that Ms. Anders spoke to Plaintiff very aggressively and checked on Valerie's performance more often than any other employee.

209.    Plaintiff's direct reports noticed that Ms. Anders was much nicer when Plaintiff wasn't there.

210.    Ms. Anders discussed openly Plaintiff's need for sick time in front of other DHC employees while Plaintiff was not there.

211.    Ms. Anders would give Plaintiff an instruction or request, and then later deny she ever gave Plaintiff the instruction or request and accuse Plaintiff of performing poorly.

212.    When engaging in the conduct described above, DHC did so with reckless indifference to Plaintiff's federally protected rights.

213.    As a result of DHC's disability based hostile work environment, Plaintiff suffered financial loss, unnecessary pain, suffering, embarrassment, mental anguish, loss of enjoyment of life and other damages and losses.

### COUNT 5
### Colorado Anti-Discrimination Act ("CADA") § 24-34-402, C.R.S. – Failure to Accommodate (Marketing Lead)
### *Against Defendant Downtown's Health Care, LLC.*

214.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

215.    Plaintiff suffers from symptoms of chronic endometriosis, a physical impairment that substantially limits major life activities including sleeping, eating, walking, bending, concentrating, thinking, and working.

216.    Plaintiff was otherwise qualified for her position of Marketing Lead, with or without a reasonable accommodation due to her education in media communications, marketing and management, along with her experience as an Event Producer, Account Manager, Social Media Manager, Customer Service Representative, Assistant Sound Engineer, Internet Travel Agent, and Musician.

217.    DHC knew of Plaintiff's disability since August 2019.

218.    In January 2022, Plaintiff and DHC agreed that because of Plaintiff's endometriosis symptoms, a hybrid work schedule in which Plaintiff would have flexibility to work either from

home or in the office would be an effective accommodation and would allow Plaintiff to perform the essential functions of her position while tending to symptoms of endometriosis.

219.    Plaintiff requested DHC implement her reasonable accommodation and authorize her to work a hybrid schedule multiple times, through email, in-person meetings, and on her staff surveys she submitted.

220.    DHC refused to engage in an interactive process and implement Plaintiff's reasonable accommodation.

221.    From January 2022 until August 9, 2022, DHC refused to allow Plaintiff a hybrid schedule as a reasonable accommodation despite previously agreeing to do so.

222.    Instead, DHC disciplined Plaintiff and placed her on two Performance Improvement Plans primarily because of complaints of her attendance and use of sick time.

223.    As a result of DHC's failure to accommodate, Plaintiff suffered financial loss, unnecessary pain, suffering, embarrassment, mental anguish, loss of enjoyment of life and other damages and losses.

**COUNT 6**
**Colorado Anti-Discrimination Act ("CADA") § 24-34-402, C.R.S. – Failure to Accommodate (New Patient Coordinator)**
***Against Defendant Downtown's Health Care, LLC.***

224.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

225.    Plaintiff suffers from symptoms of chronic endometriosis, a physical impairment that substantially limits major life activities including sleeping, eating, walking, bending, concentrating, thinking, and working.

226.    Plaintiff was otherwise qualified for her position of New Patient Coordinator, with or without a reasonable accommodation due to her education in media communications, marketing and management, along with her experience as DHC's Marketing Lead, an Event Producer, Account Manager, Social Media Manager, Customer Service Representative, Assistant Sound Engineer, Internet Travel Agent, and Musician.DHC knew of Plaintiff's disability since August 2019.

227.    In August and September 2022, Plaintiff and DHC agreed that because of Plaintiff's endometriosis symptoms, she required a reasonable accommodation of reassignment to a New Patient Coordinator position, fully remote.

228.    Plaintiff provided DHC an ADA provider statement that indicated she needed accommodations to be able to time-shift and take breaks when her pain is flaring and resume tasks when able. Plaintiff's provider stated that remote work would be an effective accommodation.

229.    On September 20, 2022, instead of providing Plaintiff her accommodation, DHC terminated plaintiff.

230.    DHC admitted that they decided to terminate Plaintiff the day after they received her ADA provider statement.

231.    DHC posted a job opening for a New Patient Coordinator days before deciding to terminate Plaintiff.

232.    Immediately following Plaintiff's termination, DHC hired an outside applicant for a New Patient Coordinator.

233.    As a result of DHC's failure to accommodate, Plaintiff suffered financial loss, unnecessary pain, suffering, embarrassment, mental anguish, loss of enjoyment of life and other damages and losses.

## COUNT 7
### Colorado Anti-Discrimination Act ("CADA") § 24-34-402, C.R.S. – Disability Harassment Hostile Work Environment
### *Against Defendant Downtown's Health Care, LLC.*

234.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

235.    Plaintiff suffers from symptoms of chronic endometriosis, a physical impairment that substantially limits major life activities including sleeping, eating, walking, bending, concentrating, thinking, and working.

236.    Plaintiff was otherwise qualified for her positions of Marketing Lead and New Patient Coordinator, with or without a reasonable accommodation due to her education in media communications, marketing and management, along with her experience as an Event Producer, Account Manager, Social Media Manager, Customer Service Representative, Assistant Sound Engineer, Internet Travel Agent, and Musician.

237.    DHC knew of Plaintiff's disability since August 2019.

238.    After Plaintiff requested a reasonable accommodation of a hybrid work arrangement in January 2022, DHC fostered an abusive and hostile work environment because of Valerie's ongoing disability and time off work.

239.    Ms. Anders targeted Plaintiff and blamed her for things out of her control.

240.    Ms. Anders yelled, ridiculed, and gaslighted Plaintiff in front of Plaintiff's subordinates.

241.    For example, in one instance, Ms. Anders made a snide remark about Plaintiff's need for time off work due to her disability in front of other employees.

242.    Plaintiff told Ms. Anders that the comment was unnecessary, and she should not talk about her need for time off work in front of other employees.

243.    In response, Ms. Anders yelled "shut up" to Valerie and accused her of being defensive.

244.    Ms. Anders stormed out of the room into her office and slammed the door behind her.

245.    Minutes later, Ms. Anders called Plaintiff into her office, shut the door, and continued to berate her and yell at her.

246.    On April 27, 2022, Ms. Anders put Plaintiff on a Performance Improvement Plan and artificially inflated the number of Plaintiff's unexcused absences to falsely accuse that Plaintiff was in violation of DHC time off policy when she in fact wasn't.

247.    On August 9, 2022, Ms. Anders put Plaintiff on a second Performance Improvement Plan and again artificially inflated the number of Plaintiff's unexcused absences to falsely accuse that Valerie was in violation of DHC time off policy when she in fact wasn't.

248.    Plaintiff's direct reports noticed that Ms. Anders spoke to Plaintiff very aggressively and checked on Valerie's performance more often than any other employee.

249.    Plaintiff's direct reports noticed that Ms. Anders was much nicer when Plaintiff wasn't there.

250.    Ms. Anders discussed openly Plaintiff's need for sick time in front of other DHC employees while Plaintiff was not there.

251.    Ms. Anders would give Plaintiff an instruction or request, and then later deny she ever gave Plaintiff the instruction or request and accuse Plaintiff of performing poorly.

252.    As a result of DHC's disability based hostile work environment, Plaintiff suffered financial loss, unnecessary pain, suffering, embarrassment, mental anguish, loss of enjoyment of life and other damages and losses.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and award all relief as allowed by law and equity, including, but not limited to the following:

(a)    Compensatory damages, including but not limited to those for emotional distress and pain and suffering;

(b)    Back pay and related compensation, and front pay;

(c)    Economic and consequential damages arising out of Defendants' conduct;

(d)    Injunctive and/or declaratory relief;

(e)    Reinstatement;

(f)    Punitive damages for claims as allowed by law;

(g)    Pre-judgment and post-judgment interest at the highest lawful rate;

(h)    Attorneys fees and costs; and

(i)    Such further relief as justice requires.

**Plaintiff requests a trial to a jury on all issues so triable.**

DATED this 27th day of November, 2023.

Respectfully submitted,

*s/ Aaron Slade*
Aaron Slade, Esq.
NOVO LEGAL GROUP, LLC
4280 Morrison Rd.
Denver, CO 80219
T: 303-335-0250
F: 303-296-4586
E: aslade@novo-legal.com

*s/ Danielle Jefferis*
Danielle C. Jefferis, Esq.
NOVO LEGAL GROUP, LLC
4280 Morrison Rd.
Denver, CO 80219
T: 303-335-0250
F: 303-296-4586
E: danielle@novo-legal.com